## Price's Estate.    Martin's Appeal.

1. An executor, who was also surviving partner of the testator, charged himself in his account with $2262 as the value of the testator's interest in the firm ; the auditor, after a tedious examination of books, &c., found that the interest was worth $2242 more, and surcharged him with that sum : *Held*, that the burden of the expense of resisting the claim should not be thrown on the estate.

2. The accountant was not entitled to credit for counsel fees in such litigation, but should be allowed such as were rendered for the benefit of the estate and in protecting himself in defending proper items in his account.

3. Where an accountant has not been guilty of fraud or bad faith, he should not be deprived of commissions merely because he has been surcharged in his account.

4. The testator gave all his estate in trust to pay the income to his wife for life ; on her death, to his mother on the same trust ; after her death, to three persons absolutely. He then directed the executor to purchase a watch for another legatee, and gave $500 to each of two charitable institutions. The auditor decided that the primary intent was to devote the income of his estate for the support of his widow and mother during their lives, and that therefore the payment of the specific legacies was to be postponed until the termination of the life estate : *Held* to be correct.

February 29th 1876.    Before SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeals from the Orphans' Court of *Philadelphia* : Of January Term 1875, No. 18.    In the estate of Harry F. Price, deceased.

The decedent died on the 17th of September 1869, leaving a widow, but no children. He left a will, dated April 6th 1869, and proved September 22d 1869 ; letters testamentary were issued to Thomas J. Martin, the executor named in the will.

After directing the payment of his debts and funeral expenses, the will is as follows :—

" 2d. I give, devise and bequeath to Thomas J. Martin, my ex-. ecutor, all my estate, real, personal and mixed, to have and to hold the same in trust, for the following uses and purposes : To collect all my personal estate, and invest the same in bonds and

[Price's Estate.]

mortgages, and to pay the income thereof, and the rental of all my real estate to my beloved wife, Mary Price, half-yearly, during her natural life, so long as she shall remain my widow; and in the event of the death of my said wife, or her re-marriage, then I give, devise, and bequeath the same, subject to the same trust, unto my mother, Jane Price, for and during the term of her natural life; and should my mother then be deceased, then I give the same, in fee simple, to William R. Price, Charles M. Price, and Caroline, wife of Lukens Clayton, in equal shares.

"3d. And upon the death of both my said wife and mother, I give, devise, and bequeath all my estate unto William R. Price, Charles M. Price, and Caroline, wife of Lukens Clayton, in fee simple; and if any of them be deceased, their children to take their parents' share.

"4th. I direct my executor to purchase a watch or other present, of the value of one hundred dollars, to be given to Sarah Martin, daughter of my friend Thomas J. Martin.

"5th. I give and bequeath to the House of the Good Shepherd, and to the St. John's Orphan Asylum, the sum of $500 each."

*        *        *        *        *        *        *

At the time of his death, the testator was in partnership with his executor, under the firm name of Thomas J. Martin & Co.

No inventory and appraisment of his estate appears to have been made, but shortly after the testator's death the whole partnership stock was appraised by the executor and surviving partner, and the testator's share, one-eighth, fixed at $2662.89.

The 19th of October 1870, the executor filed his account; he charged himself with rents of the real estate of the testator, the proceeds of a few chattels sold by him, and the following item:—

"Balance of H. F. Price's one-eighth interest of profits of firm of T. J. Martin & Co., $2662.89."

The whole amount of charges was $3397.89.

The amount of credits claimed was $1553.23, showing a balance of $1844.66 due the estate. Amongst other items of credit were two amounting to $175, for payments to L. C. Cassidy, Esq., for professional services; and an item for commissions, 5 per cent on $3397.89, amounting to $169.89.

The account was referred to H. S. Hagert, Esq., to audit and settle, and report distribution of the balance.

Before the auditor, exception was taken by the widow of the decedent to a number of the items of credit, amongst others to the amount charged for commissions. The charges for rent were also objected to as not belonging to the administration account. These, with some credits for payments on account of the real estate, were by agreement stricken from the account.

The principal matter in relation to which objection was made, was the charge for the testator's interest in the firm of T. J. Mar-

tin & Co., which the widow claimed should be very much increased.

In his report, the auditor says:— * * *

"An examination of the correctness of this credit involved an examination and settlement of the partnership books and accounts of Thomas J. Martin & Co., and a further investigation of the business carried on after Mr. Price's death.

"Prior to August 1st 1864, Thomas J. Martin, the present executor, was engaged in the wholesale liquor business, and also in the business of brewing in the city of Philadelphia, had considerable capital invested, and enjoyed a large and well-established trade. At that date he took with him into partnership, the decedent, Harry F. Price, who contributed no capital, but only his services to the business. In addition to the capital which Mr. Martin had invested in the business, he also gave to it his time and attention. No written articles were entered into upon the formation of the partnership, but on April 7th 1868, the following paper was drawn up and executed by Martin and Price :—

" ' Whereas, on the first day of August, A. D. 1864, Thomas J. Martin and Harry F. Price entered into copartnership for the purpose of carrying on the wholesale liquor business, and which copartnership still exists; and whereas, no written agreement between said Thomas J. Martin and Harry F. Price has been previously executed to confirm said copartnership, or show the relations existing between each of said parties as partners: These presents witnesseth, that it was and is mutually agreed upon by said Thomas J. Martin and Harry F. Price, that the net profits realized from the business carried on by them at, &c., are to be so divided that Thomas J. Martin shall receive seven-eighths of the amount, and the balance, or one-eighth, shall be received by Harry F. Price.'

"Under this agreement and upon these terms Martin and Price carried on the liquor business until July 1st 1869, when Henry Johnson was admitted into the firm, the brewing business having been discontinued some time before. Johnson put in no capital, and was to receive one-fourth of the profits, Price still retaining his one-eighth interest.

"At the time of Johnson's admission into the firm, an inventory was made of the stock of whiskey on hand, which then amounted, at the appraised value, to $139,460.85, and there was standing at that time to the credit of Harry F. Price, on the books of the firm, $5066.79. * * * * *

"At the time of Price's death, the amount to his credit on the books had been reduced, by his drawings, to $4587.91, which, together with the amount to the credit of his copartner Martin— viz., $116,228.39—was represented by the stock in trade, book accounts and other assets of the firm. Shortly after Mr. Price's

[Price's Estate.]

death an inventory was taken of the stock on hand at that time, and the stock appraised by Martin, the surviving partner, at $104,462.73. After some time the books were closed, showing a loss on the business, since July 1st 1869, of $7572.17.

" After Price's death Martin continued to carry on the business with the stock and assets of the old firm, together with such additional stock as he purchased from time to time, but with little or no profit, until July 1872, when he disposed of the business to William N. Graham, who had been taken into the firm at Price's death. *     *     *     *     *     *

" The correctness of the appraisement made by Martin of the stock on hand at the death of Price was attacked by the counsel for the widow, * * *   An examination of the books of the firm shows that the appraisement of September 24th 1869 was made at prices below those at which the same stock had been appraised by Martin on July 1st 1869, while in the sales entered on the books between those dates and immediately and for a long time subsequent thereto there appeared no reduction in the prices at which the goods were sold. Although it may be true, as was testified before the auditor, that there was no market in the latter part of 1869 for any considerable quantity of whiskey at the appraised value, it is equally true that the stock, when sold by Mr. Martin, yielded a considerable advance on those values; and a surviving partner who elects to keep the stock instead of selling it, and to carry on the business for his own advantage, ought not to be permitted to take it at a price which could have been obtained for it only by its sacrifice at a forced sale in a peculiarly unfavorable market, such as the accountant alleged existed, from special and temporary causes, in the autumn of 1869. He can have no reason to complain if he is called upon to account for the stock, at its fair average price, under ordinary conditions of the market. Such a valuation the auditor finds in the appraisement made of the stock by Mr. Martin in July 1869, the correctness of which has not been questioned before the auditor. And adopting the valuation of that date, it will appear that the appraisement of September 1869 should be increased by the sum of $18,023.75. As a result of carrying this increase in the 'merchandise account' into the ' profit and loss' account, we find that, instead of the business from July 1st 1869 to September 21st 1869 showing a loss of $7572.17, it yields a profit of $10,451.58, one-eighth of which, or $1306.44, is to be added to the July statement of Harry F. Price's account, making the true amount which should be to his credit at the date of his death, $5894.35. Deducting from this latter sum his share of the bad debts * * * amounting, &c. * * * and we have a balance of $4904.98, which was the true amount of Harry F. Price's interest in the firm at his death on September 6th 1869, for which the executor

[Price's Estate.]

is to account, instead of $2622.89, as charged in the account now before the auditor.          *          *          *          *

" By the tenor of the agreement, and from the evidence afforded by the entries in the partnership books, it is clear that Price was entitled to one-eighth of the profits of the business, and that he originally contributed no capital. * * * The books of T. J. Martin & Co. show clearly to the mind of the auditor that it never was the understanding of H. F. Price that he had any fixed or definite interest in the capital of the firm, or any interest in the stock of assets, except in so far as the stock and assets represented his share of the undrawn profits of the business. The account of Thomas J. Martin is credited on the books, with the whole amount of the stock on hand, at the several dates of settlement, and is debited with the amount due to H. F. Price for his share of the profits; and nowhere is Mr. Price credited with any share of the capital stock of the firm. His interest, wherever it appears upon the books, is stated to be one-eighth of the profits, and this share of the profits is all that is carried to his credit. There is, therefore, no room for doubt that it was well understood between the partners that the interest of Price was confined to the profits alone, and he could not, therefore, have justly claimed to be admitted to share with his copartner, Martin, in the capital which, as the evidence shows, was wholly contributed by the latter.

" But, on the other hand, the proposition of the accountant's counsel that Mr. Price had no interest in the stock on hand at his decease is equally untenable. The books of the firm show there was standing to his credit at the time of his death, an amount of undrawn profits now ascertained to be $4904.98, which equally with the capital contributed by Martin was represented by the stock in trade and other assets of the firm.

" To the extent of those undrawn profits, he had an interest in, and was a tenant in common with his copartners of the stock and assets which had been purchased by and accumulated from the capital and profits of the ' business.' The decedent having therefore a joint interest with Martin in the stock, it became the duty of Martin, as surviving partner, to sell the stock and wind up the business. * * * Martin, as a surviving partner, had no right to take the stock at a valuation; and as executor of the decedent, he was clothed with the further trust to protect the interests of the widow and the creditors, and to make sale for the purpose of distribution. * * * This duty he failed to perform, but appraised and retained the property, and continued to trade with the old stock. In failing to make an immediate sale of the stock, he appears to have been influenced by a desire to avoid the sacrifice which would in all probability have resulted, had so large a stock of goods been thrown upon the market immediately upon Mr. Price's death. His own share of the stock was greatly in excess of decedent's,

[Price's Estate.]

and his interest in preserving it identical with that of decedent's estate ; no imputation of fraud or unfair dealing can be justly attributed to him in declining to make sale of the stock.   By retaining the stock and continuing to deal with it, he became liable to account to the decedent's estate for all subsequent profits, while the responsibility for losses fell entirely upon his own shoulders. * * * There is no fixed rule at law which measures the interest of the deceased partner in the profits by the interest which he had in the business during his lifetime. * * * Out of this difficulty of apportioning the profits, has arisen the simpler rule which gives to the estate of the deceased partner his share of the stock at the time of his decease, with interest upon the same in lieu of profits. * * * It is manifestly for the interest of the *cestui que trust*, that the rule allowing interest in lieu of profits should be adopted in the present instance ; and moreover, the accountant, by neglecting to invest the moneys of the estate by mixing them with his own, and by failing to account until cited so to do, has subjected himself to the penalty of paying interest upon the balance in his hands.   The auditor has concluded to charge the accountant with the value of the decedent's interest in the partnership at the time of his death, with interest upon the same to the date of the filing of this report ; first deducting any payments which the accountant may have made in the settlement of the estate.   *   *   *

" Having found nothing in the conduct of the executor which savors of actual fraud or bad faith on his part in the administration of the estate, the auditor sees no reason to disallow commissions to the accountant, or to charge him with the expenses of the audit, as requested by the counsel for the widow."   *   *   *

The auditor adjusted the account by increasing the charge for the testator's interest in the firm to $4904.48, striking out the charges for rents, allowing the accountant $83.60 commissions at 5 per cent. on $1672.09, the amount of the surcharges (after deducting the rents struck out), and making other corrections not necessary to particularize on both sides of the account.   This resulted in a balance of $3394.16 against the accountant as of September 17th 1869, on which he added interest until May 16th 1873, the date of filing his report, being $746.68, making the total balance due by the accountant, $4140.84.

The expenses of the audit as allowed by him, were :—

| | |
|---|---:|
| " Auditor's fee as per order, . . . . | $350.00 |
| Pierce Archer, Esq., professional services, . . | 500.00 |
| L. E. Burke, Esq.,          "          " . . | 150.00 |
| Orphans' Court, . . . . . . | 25.62 |
| Advertising, &c., . . . . . . | 6.50 |
| | $1032.12 |
| Leaving for distribution, . . . . | $3108.72" |

[Price's Estate.]

Of this sum he distributed $699.28 to creditors who presented their claims to him, making the balance distributable under the will $2409.44.

In reporting on this distribution, the auditor said:— * * *

"Neither the legacy to the 'House of the Good Shepherd,' nor that to the 'St. John's Orphan Asylum,' was claimed before the auditor. The gift of all his real and personal estate to his executor, in trust for the use of his wife and mother for life, with remainder to William and Charles Price, and to Caroline Lukens, is inconsistent with the subsequent bequests to Sarah Martin, and to the two charitable corporations named in the will; as a rule of construction, where two parts of a will are inconsistent, the latter prevails, but this is applied only after the failure of every endeavor to give such a reasonable construction to the entire dispositions as will render every part of them operative. * * *

"In the present instance, the primary intent of the testator seems to be, to make provision for the support of his widow and mother during their lives, and to devote the income of his entire estate, both real and personal, to that purpose. Such a purpose is at variance with an intention to make the pecuniary legacies payable in the lifetime of either the wife or mother of the testator. In the opinion of the auditor the payment of those legacies is to be postponed until the termination of the two life estates.

"The fund for distribution, under the will, is $2409.44, of which amount $1662.76 is principal, and $746.68 is interest upon the fund in the accountant's hands at decedent's death.

"The auditor awards the above sum of $746.68 to Mary Price, the widow of the decedent. * * * The remainder of the fund, $1662.76, the auditor directs to be paid to the trustee appointed in the place of Thomas J. Martin, to be invested by him, and the interest paid to Mary Price, during her lifetime or widowhood, and after her death or marriage, to Jane Price, for life, and upon the death of both legatees, then to pay the legacies bequeathed respectively to Sarah Martin, to the House of the Good Shepherd, and the St. John's Orphan Asylum, if the same shall be claimed by them, and to divide the balance between William R. Price, Charles M. Price, and Caroline, wife of Lukens Clayton, in equal shares."

The executor filed exceptions to the report as follows:—

2. Because the auditor erred in surcharging the accountant with the sum of $2242.09, being the difference between the appraisement of July 1st 1869, $4904.98, and of September 24th 1869, $2662.89.

4. Because the auditor erred in deciding that Price was a partner and had an interest in the stock.

6. Because the auditor held that it was the duty of Martin to sell the stock at the death, and, failing to do so, was chargeable

[Price's Estate.]

with the highest price therefor, even though he, Martin, furnished all the capital.

7. Because the auditor erred in charging the accountant with interest on the increased appraisement from the time of death.

9. Because the accountant was allowed commissions only on $1675 of surcharges, and not on $2242.

. Sarah Martin, St. John's Orphan Asylum, and the House of the Good Shepherd excepted, because the auditor reported that the payment of their legacies was to be postponed until after the death of testator's widow.

Mary Price, the widow, filed the following exceptions to the report:—

1. Because the auditor has allowed to Pierce Archer, Esq., the counsel for the executor, a fee of $500.

4. Because the auditor erred in deciding that the testator was not entitled to the one-eighth part of the stock of goods in the store which were on hand at the time of the death of the testator.

7. Because the auditor erred in allowing the accountant commissions when he has surcharged him with the sum of $746.68.

8. Because the auditor has erred in not charging the accountant with the whole expenses of the audit.

10. Because the auditor has erred in saying "that he finds nothing in the conduct of the executor which savors of fraud or of bad faith on his part in the administration of the estate," when by the whole argument and finding of the auditor, in his report, it shows that the conduct of the accountant, as surviving partner and executor, had been illegal and wrong.

11. Because the auditor has allowed the sum of $25.62 to the clerk of the Orphans' Court, an illegal charge.

The Orphans' Court, Allison, P. J., made the following decree on the exceptions, December 6th 1873:—

" The 1st exception, which relates to the allowance of $500 to the counsel of the executor, is sustained.

" The 7th exception to the allowance of commissions to the accountant is sustained.

" The 8th exception is sustained in so far as to disallow $300 of the $350 of the auditor's fee.  The $150 awarded to L. Burk is disallowed.  The allowance to the clerk of the Orphans' Court is reduced to $11.65.

" The remaining exceptions of Mary Price, widow and legatee, are discharged.

" The exceptions to the report of the auditor on the trust account of Thomas J. Martin are dismissed and report confirmed."

The case was referred to A. J. Fortin, Esq., deputy clerk of the Orphans' Court, to state an account in accordance with the foregoing decree.

In making the statement, the $150 awarded by the report to

[Price's Estate.]

L. E. Burk, but disallowed by the court, was allowed to the accountant, because no exceptions had been taken to the report as to that item.

The account as stated by him showed a balance of $3392.07 due the estate, of which $746.68 was interest and $2645.39 principal.

On this the court made the following final decree :—

" And now, September 2d 1874, the within report, made by the clerk under the order of this court, is confirmed.   The sum of $150 to L. E. Burk, as allowed by the clerk, is approved, the counsel on both sides assenting thereto ; and the court order and decree that the said executor, Thomas J. Martin, pay the sum of $3392.07, as stated by the clerk, to the persons to whom the respective sums were awarded by the report of the auditor, and said report is now finally confirmed.   All the exceptions not allowed by the court on the 6th day of December 1873 are dismissed."

The accountant and the specific legatees appealed to the Supreme Court.

The accountant assigned the following " errors :"—

1. Sustaining the 1st exception of Mary Price to the auditor's report, which objected to the allowance of $500 counsel fees to executor's attorney, for services rendered the estate during the period of four years, thereby surcharging the executor with the same.

2. Sustaining the 7th exception of Mary Price to the auditor's report, in disallowing the sum of $169.89, executor's commission, and surcharging him therewith.

3. Sustaining the 8th exception of Mary Price to the auditor's report, in surcharging the executor with the auditor's fee, $300.

4. Dismissing the accountant's 2d exception to the auditor's report, whereby the executor was surcharged with the difference, $2242.09, between the appraisements of July 1st and September 24th 1869, on the ground that it was the executor's duty to sell out the stock of $105.000.

5. Reversing the report of the auditor, upon the facts upon the 1st, 2d and 3d exceptions of Mary Price, no mistake being apparent on the face of the report.

6. Dismissing the accountant's seventh exception and disallowing the accountant and surcharging him with the sum of $1019.89 for counsel fees, commissions and auditor's fees, besides surcharging him with 2242.09 and interest thereon, making total surcharges in all of $1672.09 in the face of the auditor's report upon the evidence that he acted with fidelity and in good faith, and was in no degree guilty of any fraud.

The other appellants assigned for error : dismissing the first exception of each of the appellants to the auditor's report in deciding that the legacies were to be postponed till after the widow's death.

[Price's Estate.]

*P. Archer, Jr.*, and *L. C. Cassidy*, for appellants.—The auditor reported that the executor acted with fidelity, in perfect good faith, for the best interests of his trust, and without imputation of fraud; and he should not be surcharged with the expenses of contesting a claim as to which he is vindicated by the evidence and finding: Speakman's Appeal, 21 P. F. Smith 25; Pittsburg's Appeal, 20 Id. 142; Chew's Appeal, 9 Wright 228; Price's Appeal, 4 P. F. Smith 472; Mengas's Appeal, 7 Harris 221. The facts found are regarded as established, unless for flagrant error: Mellon's Appeal, 8 Casey 121; Stehman's Appeal, 5 Barr 413; White's Appeal, 12 Casey 134; Harland's Accounts, 5 Rawle 323. Even though the audit was made necessary by errors in the account, the accountant should not be charged with the expenses of audit: Yoder's Appeal, 9 Wright 394; Harding's Estate, 12 Harris 189; Smith's Appeal, 11 Wright 424; Swartzwalter's Account, 4 Watts 77; Norris's Appeal, 21 P. F. Smith 106. As to the appeals of the specific legatees, they cited Schott's Estate, 28 P. F. Smith 40; McGirr v. Aaron, 1 Penna. R. 48; West v. Shuttleworth, 2 M. & K. 681.

*A. V. Parsons*, for appellee.—The unfaithfulness of the executor deprives him of commissions as much as *actual fraud*: Smith's Appeal, 11 Wright 427; Greenfield's Estate, 12 Harris 232. As to counsel fees he cited Dietterich v. Heft, 5 Barr 87; Heister's Appeal, 7 Barr 455; Verner's Estate, 6 Watts 250; Mumper's Appeal, 3 W. & S. 441; Gossner's Estate, 6 Wharton 401; Sterrett's Appeal, 2 Penna. R. 419.

Mr. Justice PAXSON delivered the opinion of the court, March 13th 1876.

The first assignment alleges error in surcharging the accountant with the sum of $500, paid counsel for professional services. Upon what ground said surcharge was made we are not informed, as no opinion was filed by the learned judge of the Orphans' Court. It is always desirable in such cases to know the reasons of which the decree of the court below was predicated. The auditor's report, however, discloses sufficient to show that the action of the Orphans' Court should be in part sustained. The executor was also the surviving partner of the testator; in his account he charged himself with the sum of $2662.89, as the value of the deceased partner's interest in the firm. The auditor surcharged him with the sum of $2242.09, as the real value of said interest. The contention upon this question protracted the audit very greatly, and involved a tedious examination of the books and the business of the firm. The burden of this increased expense ought not to be thrown upon the estate. It should be borne by the unsuccessful party by whom it was occasioned. It would be manifestly unjust to charge the widow,

[Price's Estate.]

who succeeded in thus surcharging the accountant, with the amount expended by him in counsel fees in resisting her claim. But we think it was error to strike out all allowance for counsel fees. The accountant was entitled to the services and advice of counsel, and so far as those services were rendered for the benefit of the estate, or to protect the accountant in his rights, compensation should be made therefor out of the estate. An examination of the auditor's report discloses the fact that the widow objected to a number of items on the credit side of the account, which were allowed by the auditor. Among them was the item of funeral expenses. It is also noted that she attempted to surcharge the accountant with a much larger sum, as the value of the testator's interest in the firm, than was found by the auditor. It is only right that a reasonable allowance should be made out of the estate, to pay for this portion of the services of counsel. We think $150 is sufficient for this purpose. The accountant must be surcharged with the residue, to wit, $350.

We think the court below erred in disallowing the accountant's claim to commissions. The auditor finds that he was not guilty of actual fraud or bad faith. It would be a harsh rule to hold that, in the absence of fraud or bad faith, an accountant should be deprived of his commissions merely because he has been surcharged in his account, especially when the subject of the surcharge was the value of the testator's interest in the profits of a business. It is unnecessary to refer to the cases upon this point. The whole subject has been thoroughly discussed in a number of recent decisions. None of them sustains the disallowance of commissions in this case.

No question as to the amount of the auditor's fee was raised in the court below. It was fixed by the agreement of the parties, with the approval of the court. The question is whether it shall be paid by the accountant or by the estate. The court below surcharged the accountant with all but fifty dollars of the amount. What we have said upon the first assignment of error is equally applicable here. The necessary and proper expenses of the audit should be paid out of the estate. So far as they were increased unnecessarily by the accountant the burden should fall upon him.

It is not easy to fix the precise line of division, but in our judgment the estate should pay $150 of the auditor's fee. The accountant must be surcharged with the residue thereof, to wit, $200.

There are three other appeals in this estate, viz.: Appeal of Sarah Martin, legatee, appeal of St. John's Orphan Asylum, legatee, appeal of House of Good Shepherd, legatee. Neither of these appellants appeared before the auditor to claim any legacy or bequest under the will, nor were the appeals pressed, upon the argument here. The auditor has given satisfactory reasons why

31 P. F. Smith—18

[Price's Estate.]

the payment of the respective legacies should be postponed until after the termination of the life estates.   As to each of these appeals the decree of the court below must be affirmed, and the appeals dismissed at the cost of the respective appellants.

In the appeal of Thomas J. Martin, executor, the decree is reversed, and the record remitted for further proceedings.