## Pleasonton's Estate.

700

*Maurice Stern* and *James A. Walker*, for exceptants.

*Thomas Raeburn White*, of *White, Parry, Schnader & Maris*, and *John Cadwalader, Jr.*, contra.

VAN DUSEN, J., Jan. 21, 1931.—One set of exceptions attack the trustee's commissions. Most of the reasons have been considered and rejected in the Keen Estate [14 D. & C. 697], where the facts were substantially the same, and they need not be referred to further. Some reasons, however, are new, namely:

*(a)* That no account was filed for thirty years. There was a life tenant until 1907, and thereafter the remaindermen were absolutely entitled. One of them, Mabel, was feeble-minded. During most of the time her next of kin was her sister Beatrice, who was entitled to the other part of the estate. By common consent, this account ran on until 1920, together with the Keen account and the Atlantic City real estate account, for the practical benefit of the parties. In that year Beatrice withdrew what she was satisfied to accept as her share, and the administration of the trust continued for the benefit of the other sister. In the absence of any request for termination of the trust on behalf of the beneficiaries, we cannot say that the failure to close the matter or to file interim accounts is ground for denying commissions.

*(b)* That the active executor filed a petition for discharge of his co-executor on the ground that all the duties of the trust had been performed at a time when there was considerable money still in the possession of the trustees. The record before the auditor does not disclose this contention or any facts on which to base it.

*(c)* That the accountant contested the jurisdiction of the court. This he is entitled to do without being penalized in case of failure.

*(d)* That the account on its face shows uninvested principal and undistributed income. We conclude below that there are no such uninvested balances shown to us as to lead to a surcharge for loss of interest. If so, there should be no loss of commissions for that reason.

The whole conduct of the trustee is to be taken together in judging his right to compensation, and it does not appear to be different in substance from that which was passed on in the Keen Estate, except that we are more fully aware of the difficulties which arise from the failure of the trustee to apply payments in distribution as he made them to the Keen or the Pleasonton account. But this is not sufficient to change our general opinion.

The auditor, following Price's Estate, 81 Pa. 263, allowed fees to counsel for the accountant for general services and also fees apportioned to the unsuccessful parts of the attack upon the accountant's administration. He excluded future services, and no request is now made for any more. The application of that decision has become difficult, as the auditor remarks. The court is called upon not only to value services but to weigh the proportionate merits and plausibility of the various contentions. Our opinion on the merits may not be the same as that which may be arrived at on appeal. The general rule in this state is that each party should pay his own lawyer. On the other hand, while a trustee is not obliged to serve, he is not altogether a volunteer and is acting primarily for the benefit of another. A case may easily be imagined where a trustee would be unmercifully harassed by unfounded attacks, and the expense of defending himself would consume all his just compensation. The courts will have to do the best they can and need not be disturbed if a rule of thumb is the best that can be found. The auditor itemized the allowances as well as he could, and we see no reason to disturb his conclusions in the light of the results to which we also come.

Two points are now made on the general subject of counsel fees to which the auditor does not refer. One is the long delay in bringing the trust to an end. What we have said in this connection as to the trustee's compensation applies also to counsel fees. The other is that the trustee took a release from Beatrice for what was supposed to be her full share, whereas it is now admitted that there was more due her. But there was no contest over this paper, and it does not enter into counsel fees one way or the other.

The trustee claimed credit for 3 per cent. commissions for sale of No. 1226 Walnut Street and 1 per cent. agent's commissions for making the sale. The exceptants objected before the auditor to the 3 per cent., which was *prima facie* proper, but not to the 1 per cent., and now, somewhat disingenuously, put the two together and argue that the trustee cannot charge the estate with 4 per cent. We do not feel called upon to amend the objection. The commission is also now objected to because the sale was for $52,000 and the purchase money mortgage was $50,000. This was indeed a large mortgage, but it was eventually paid in full, and we need not consider what the result might have been if there had been a loss.

When the trustee gave money to Beatrice in supposed settlement of her share, he charged her 2 per cent. for the expense of converting securities of the estate into cash. To this she specifically agreed in writing. So much of this sum as was actually paid to another estate of which the accountant was trustee, and to which he transferred the mortgages, was allowed by the auditor as a payment in distribution for Beatrice's account. So much as was claimed to have been paid, but not proved, was disallowed. The trustee properly kept the fund invested, and while the beneficiary had a right to demand it at any time, composed as then invested, she could not ask that it be liquidated into cash immediately; and if she wanted cash, there was nothing out of the way in getting her to pay the expense of it. It is true that there was a little more due her than she actually got or knew she had a right to get; but this fact does not affect the expense of turning into cash what she did get.

Another question raised by the exceptants is thus stated: "Should not the fiduciary be surcharged with the difference in the loss of interest between current rate and the rate he obtained where a fair calculation shows that the average earning of the estate was approximately 3 per cent.?"

The auditor refused these surcharges. Among other reasons given by him was that the yield of the estate as a whole was satisfactory, to wit, 5.2 per cent., citing Cuyler's Estate, 5 D. & C. 317; Kipp's Estate, 286 Pa. 90. A wit-

ness for the accountant testified that the yield was 5.2 per cent. This was evidently based upon the principal shown by the account and not on any undistributed income in addition. As the mortgages earned from 5 per cent. to 6 per cent. and no personal property tax was paid, this is not unlikely. Upon exceptions to his draft report, the auditor received from the exceptants the report of a certified public accountant. This report calculated the Pleasonton yield as 3.314 per cent. But it is apparent from this exhibit and from Exhibits A, B and AB that these calculations persistently ignore the credit for excess distribution noted in the Keen account and brought over into this account, in spite of the warning of the auditor not to do so (see below). By doing this the calculations of Exhibit AB make the Keen yield 7.466 per cent.; and when the two are put together in Exhibit AF, that is to say, when allowance is made in the Pleasonton figures for what is left over from Keen (compare the item of $20,481.76 "average overpayments of income" in Exhibit AB), the result is 4.85 per cent., which substantially corroborates the auditor's finding of 5.2 per cent. The 3 per cent. yield which is the basis of exceptants' argument is not the true fact.

The exceptants claimed income on uninvested balances on hand consisting either of principal or income, or both, and presented quantities of figures on the subject. The calculations first offered to the auditor were based on the face of the account as filed, refusing to allow credit in distribution for excess distribution brought over from the Keen account as discussed below. The auditor was unable to use these calculations for that reason, but gave leave to submit others. Upon the hearing of exceptions, the report of the certified public accountant above mentioned was then presented. The auditor thought that the error had been abandoned, but we find on inspection that in those tables which deal with Keen and Pleasonton separately it has not. The tables which deal with Keen and Pleasonton jointly do thereby eliminate this error, but they contain another one. Uninvested balances were presented by the method of averages, that is to say, daily balances of principal and income were ascertained, all were added together and the sum was divided by the number of days. On this average balance interest was calculated for each year and compounded from year to year.

These figures, also, the auditor was unable to use because, as he said, "a trustee cannot make every penny instantly productive." The problem is specific and not general. The method of averages will show average yield and will show uninvested balances; but it will not show how long a particular sum was idle or how large it was, and that is the information which is needed. As it is not given, no surcharge can be made. It is true that the method of calculation used by the exceptants appears to show uninvested balances, even when the Pleasonton figures are put together with the Keen figures, the latter showing at times an overinvestment. The exceptants were given two opportunities to give the proper figures to the auditor, and in the interest of ending litigation they should have no more. Moreover, the average yield, discussed above, is such that, "under the circumstances of the case," no surcharge on this account would be made: Cuyler's Estate, supra; Kipp's Estate, supra. The amount cannot be great. It will serve no purpose, therefore, to determine whether in arriving at such balances undistributed income should be considered as well as principal.

The accountant made distribution to the beneficiaries without designating the money as coming from the Keen or the Pleasonton fund. He claims to apply his payments first to Keen income and then bring over the excess to the Pleasonton accounting and apply it there. This the auditor allowed, and we understand that it is the method of procedure which the Supreme Court had

in mind when it sent the Keen Estate back to us to be heard in connection with the Pleasonton Estate, though it cannot be said that the Supreme Court actually had the question before it. We agree with the auditor for the reasons he has given. Bluntly stated, the exceptants' argument is that if the trustee paid a dollar, but did not say whether it was a Keen or a Pleasonton dollar, he cannot now have credit for it in either account. In the absence of any element of prejudice to the recipient (of which we see none), it cannot be that such a position would prevail.

The trustee also filed an exception to the refusal to allow credit for distribution of $1500 out of principal to the life tenant. His argument is that no statute required her to give security for the proceeds of the sale of real estate and that she was entitled to custody of the same, just as a life tenant of personal estate was entitled at common law. This fund was raised by the exercise of a power of sale of real estate by executors, and they were expressly directed as follows: "The proceeds of any real estate so sold, however, shall be held and applied for the same purposes and for the same persons as has been provided as to such real estate." To carry out this trust the executors must retain the purchase money, and there is no analogy to the situation of a legal life tenant of personal estate.

Interest is asked by the exceptants on this amount. During Mrs. Keen's lifetime it cannot be charged, as it would only go to the benefit of the person who got the money: Bateman's Estate, 21 Dist. R. 475; Dobbin's Estate, 1 D. & C. 787. The auditor allowed the sum against Stella Keen's income which might be due her, and it will be partly consumed thereby. If there is any balance, interest should be allowed on the same at 5.2 per cent. from March 3, 1907 (date of Stella Keen's death), to March 11, 1925 (the date of accountant's death), and debited to income account, and to this extent exception No. 29 is sustained. In this instance, we think "the circumstances of the case" call for it in spite of the generally satisfactory yield. It is not money idle through lack of care, but a wrong application of money.

The exceptions of the accountant and of the distributees are dismissed, except exception No. 29 of the distributees, which is sustained as indicated above, and as so modified the auditor's report is confirmed absolutely.